Cory **GARDINER, William E. Bishop,**
**et al., Plaintiffs-Appellees,**

v.

**SEA–LAND SERVICE, INC., United**
**States Lines, Inc., etc., et al.,**
**Defendants-Appellants.**

Nos. 84–2354, 84–2547.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 17, 1985.

Decided April 8, 1986.

Fletcher, Circuit Judge, filed concurring and dissenting opinion.

A. Curtis Sawyer, Jr., Jarvis, Miller, Brodsby & Baskin, Inc., San Francisco, Cal., for plaintiffs-appellees.

Sam D. Delich, Sandra McCandless, Graham & James, San Francisco, Cal., Mark Chavez, Pillsbury, Madison & Sutro, San Francisco, Cal., Howard L. Ganz, Porskauer, Rose, Goetz & Mendelsohn, New York City, for defendants-appellants.

Before TANG and FLETCHER, Circuit Judges, and HILL,* District Judge.

TANG, Circuit Judge:

Pursuant to 28 U.S.C. § 1292(b), Defendants-Shipowners appeal the district court's denial of their motion to dismiss or for summary judgment. The issue presented is whether the provision in a seamen's collective bargaining agreement calling for a rate of maintenance will be held binding and will be enforced even if, when viewed in isolation, the rate fixed in the agreement is inadequate. The district court held that union members are not bound by such a rate of maintenance and it could not be enforced.

## I. BACKGROUND

In August, 1983, seven seamen who belong to maritime unions filed an action on behalf of themselves and a proposed class of similarly-situated seamen (Seamen) against eight maritime employers and a proposed defendant class represented by those employers (Shipowners). The Seamen assert a right under maritime law to maintenance payments from the Shipowners greater than the daily rate of $8.00 called for in the collective bargaining agreements between the Shipowners and the Seamen's unions.

The parties stipulated that the Shipowners would move for dismissal and/or summary judgment on the ground that the Plaintiffs were not entitled to the relief sought and that Defendants were entitled to judgment on the merits. Defendants argued that the collectively-bargained maintenance rates were enforceable as a matter of law. The parties also agreed that if the motion were denied, they would join in a motion for certification for interlocutory appeal under 28 U.S.C. § 1292(b), and that all further proceedings would be stayed pending the appeal.

On August 1, 1984, the district court denied the Shipowners' motion based upon its reasoning in a prior published order,

*Rutherford v. Sea-Land Service, Inc.*, 575 F.Supp. 1365 (N.D.Cal.1983). In *Rutherford*, the court surveyed the legal principles underlying the maritime right to maintenance. Based on the principle that "no private agreement may abrogate the right," *id.* at 1371 (citing, *inter alia, Cortes v. Baltimore Insular Line*, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932)), the court held that:

> [a] seaman who becomes ill or injured while in the service of his ship is not bound by the maintenance figure set forth in a collective bargaining agreement in instances in which the payment is not adequate to provide him with lodging and three meals per day of the kind and quality he would have received aboard the vessel.

*Id.* at 1370. Without review of the policies underlying federal labor law, the court concluded that "the public policy in support of the ancient right of maintenance must be found to outweigh the national labor policy" of enforcing collective bargaining agreements. *Id.* at 1373. Additionally, the court took judicial notice that a daily maintenance rate of $8.00 is inadequate to obtain food and lodging in the San Francisco Bay area of a quality comparable to that aboard ship. *Id.* at 1370.

In its order denying Defendants' motion, the district court certified the issue just discussed for interlocutory appeal under 28 U.S.C. § 1292(b). This court granted the petition for permission to appeal by order dated October 9, 1984.

## II. MARITIME RIGHT TO MAINTENANCE

■ The Seaman's right to maintenance dates back to the Middle Ages. Gilmore and Black, *The Law of Admiralty* 281 (2d ed. 1975). "Maintenance" is the duty of a shipowner to provide food and lodging to a seaman who falls ill or becomes injured while in the service of the ship. *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528, 58

* Honorable Irving Hill, United States District Judge for the Southern District of California, sitting by designation.

S.Ct. 651, 653, 82 L.Ed. 993 (1938). The right to maintenance is tied to the right to cure, i.e., necessary medical services, and both extend to the point of "maximum recovery." *Vaughn v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962). In addition, a seaman is entitled to recover unearned wages. *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 487, 47 L.Ed. 760 (1903); Norris, *The Law of Seamen* § 26.7 at 15–16 (4th ed. 1985). In sum, the elements of the common law maintenance and cure action included a living allowance during the recovery period (maintenance), reimbursement for medical expenses (cure), and unearned wages for the period from the onset of injury or illness until the end of the voyage. Gilmore and Black, 281, 305, 309.

Traditionally, maintenance has been said to serve three purposes: (1) to protect the poor and improvident seaman while ill in foreign ports, (2) to encourage shipowners to protect the seaman's safety and health while in service, and (3) to induce employment in the merchant marine. *See Vella Ford Motor Co.*, 421 U.S. 1, 3–4, 95 S.Ct. 1381, 1382–83, 43 L.Ed.2d 682 (1975), *quoting Aguilar v. Standard Oil Co.*, 318 U.S. 724, 727, 63 S.Ct. 930, 932, 87 L.Ed. 1107 (1943); *Gypsum Carriers v. Handelsman*, 307 F.2d 525, 536 (9th Cir.1962).

The duty to provide maintenance is imposed by law. *Cortes v. Baltimore Insular Line*, 287 U.S. 367, 371, 53 S.Ct. 173, 174, 77 L.Ed. 368 (1932) (*per* Cardozo, J.). The obligation is said to be an incident of the status of the seaman, and "contractual" only in that the obligation has its source in the employment relationship. *Id.* Although courts have sometimes characterized the duty as an "implied contract provision," *see, e.g., Aguilar v. Standard Oil Co.*, 318 U.S. 724, 730, 63 S.Ct. 930, 934, 87 L.Ed. 1107 (1943), they have consistently held that the right to maintenance cannot be abrogated by contract, *Cortes*, 287 U.S. at 371, 53 S.Ct. at 174.

Case law defines the extent of the right to maintenance, and how it is measured. The seaman is entitled to food and lodging of the kind and quality of that which he would receive aboard ship. *Calmar S.S. Corp.*, 303 U.S. at 528, 58 S.Ct. at 653. Traditionally, the right was restricted to actual out-of-pocket expenses. Gilmore and Black at 305; *Johnson v. United States*, 333 U.S. 46, 68 S.Ct. 391, 92 L.Ed. 468 (1948). However, more recent cases have awarded a flat per diem rate without further inquiry. Gilmore and Black at 307. A rate of $8.00 per day was judicially established in the late 1940's. *Id.* Apparently that rate has been continued down to the present time in many places, both as the rate to be paid to individual non-union seamen and the rate frequently established in collective bargaining agreements. Very recently, the $8.00 rate has been successfully challenged in cases involving individual non-union seamen. *See, e.g., Incandela v. American Dredging Co.*, 659 F.2d 11, 14 (2d Cir.1981).

When the $8.00 rate established in a collective bargaining agreement has been challenged by one or more union members, the district courts have not reached uniform results. For example, the contract provision was enforced in *Grove v. Dixie Carriers, Inc.*, 553 F.Supp. 777 (E.D.La. 1982) and *Hodges v. Keystone Shipping Co.*, 578 F.Supp. 620 (S.D.Tex.1983) and denied enforcement in *Rutherford*, 575 F.Supp. 1365. We are apparently the first Court of Appeals to decide whether the $8.00 rate as established in a collective bargaining agreement should or should not be enforced.

## III. DISCUSSION

The Shipowners advance two primary reasons to justify enforcement of the maintenance rate contained in the collective bargaining agreement. First, they argue that federal labor legislation has preempted maritime law. Second, they argue that absent preemption, the give and take process of collective bargaining and the range of other benefits accruing to seamen as a consequence of collective bargaining justify enforcement of the contracted maintenance rate.

### A. Preemption

In *City of Milwaukee v. Illinois*, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), the Supreme Court articulated a test for determining the preemptive effect of a federal statute over federal common law.[1] Referring to *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978) (Court refused to provide damages for "loss of society" under general maritime law when not provided for in Death on High Seas Act), the Court stated that the question was whether the legislative scheme "spoke directly to a question," not whether Congress had affirmatively proscribed the use of federal common law. *City of Milwaukee*, 451 U.S. at 315, 101 S.Ct. at 1791. Maritime law will be preempted by statute if applying that common law would entail "rewriting rules that Congress has affirmatively and specifically enacted." *Mobil Oil*, 436 U.S. at 625, 98 S.Ct. at 2015. Thus where Congress has spoken, courts "need not pause to evaluate ... opposing policy arguments ... [for] Congress has struck the balance for [the courts]." *Id.* at 623. In evaluating the displacement issue, courts must assess the scope of the legislation and whether the legislative scheme addresses the problem formerly governed by federal common law. *City of Milwaukee*, 451 U.S. at 315 n. 8, 101 S.Ct. at 1792 n. 8.

The Shipowners claim that the labor statutes "speak directly" to and preempt the maritime right to maintenance in two ways. First, the Shipowners contend that non-enforcement of the maintenance provision subverts the statutory mandate that unions be the exclusive representatives of their members in bargaining with the employer. 29 U.S.C. § 159(a). The Shipowners imply that enforcement of the provision promotes the policy of allowing employees to engage in negotiations with respect to the rate of maintenance. We find this contention unconvincing. The exclusive representation principle has been restricted to situations in which employees on their own initiative have accepted terms of employment outside those of a collective bargaining agreement, or side-stepped the authority of the union to impose obligations upon its members. *See Scofield v. NLRB*, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969); *Hendricks v. Airline Pilots Association International*, 696 F.2d 673 (9th Cir.1983); *NLRB v. Tanner Motor Livery, Ltd.*, 419 F.2d 216 (9th Cir.1969). In the instant case, the employees are not acting on their individual authority, but under the authority of externally-imposed maritime law.

Second, the Shipowners contend that non-enforcement of the maintenance provision conflicts with a provision in the Labor Management Relations Act which provides for an exclusive judicial procedure by which union members may press claims or grievances against their employer or union arising from the dissatisfaction with the collective bargaining process. 29 U.S.C. § 185(a). By its language, however, section 185(a) does not apply to the Seamen's claims. This provision applies to "[s]uits for violation of contracts" between employers and labor organizations.

The Seamen brought suit, not for violation of the collective bargaining agreement, but for a violation of maritime law. The Seamen brought suit pursuant to the district court's admiralty jurisdiction. 28 U.S.C. § 1333(1). Thus, section 185(a) does not have preemptive effect.

We note that refusal to enforce the collectively-bargained maintenance rate would vitiate somewhat several of the policies underlying the federal labor laws. These include the policy of enforcing a collective bargaining agreement in order to promote stability in labor-management relations, *see Toyota Landscape Co. v. Building Material and Dump Truck Drivers Local 420*, 726 F.2d 525, 529 (9th Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 104, 83 L.Ed.2d 49 (1984), the policy that the terms of agreements are to be determined by the free

---

**1.** Admiralty jurisdiction has long been recognized as an area in which federal courts may make federal common law. *Texas Industries,* *Inc. v. Radcliff Materials,* 451 U.S. 630, 642, 101 S.Ct. 2061, 2067–68, 68 L.Ed.2d 500 (1981).

play of economic forces, *see Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 140 n. 4, 96 S.Ct. 2548, 2553 n. 4, 49 L.Ed.2d 396 (1976), the principle of self-government by employees and the democratic process of union representation.

However, these conflicts are of a less direct nature than the conflict between the federal statutory law and federal common law which gave rise to preemption in the cases cited by the Shipowners. In *Mobil Oil*, the Court refused to provide damages for "loss of society" under maritime law when Congress had not provided for such damages in the Death on the High Seas Act. 436 U.S. at 625, 98 S.Ct. at 2015. That Act considered issues such as the beneficiaries, the limitations period, contributory negligence, survival, and damages under a wrongful death action. *Id.* Since Congress had "spoken directly" to the question of damages, the Court did not feel free to "supplement" Congressional action by prescribing a remedy. *Id.*

In *City of Milwaukee*, the Court determined that the 1972 Amendments to the Federal Water Pollution Act "had not left the formulation of appropriate federal standards to the courts through application of often vague and indeterminate nuisance concepts ..., but rather [had] occupied the field through the establishment of a comprehensive regulatory program supervised by an expert agency." 451 U.S. at 317, 101 S.Ct. at 1792. For example, the Court found that the problem of effluent limitations for discharges from treatment plants had been addressed through the administrative scheme, and that there was no basis for federal courts to impose more stringent limitations. *Id.* 101 S.Ct. at 1795–96. *See also Matter of Oswego Barge Corp.*, 664 F.2d 327 (2d Cir.1981).

In sum, it does not appear that Congress has "spoken directly" to the question of a seaman's traditional right to maintenance through the federal labor laws. We conclude therefore that federal labor statutes have not preempted maritime law.

**B. Quid Pro Quo**

■ Although the principles of maritime law with respect to the seaman's right to maintenance have not been preempted by federal labor statutes, we conclude that the broad policies which undergrid the labor laws, as well as the nature of the collective bargaining process, require nevertheless that the maintenance rate expressed in the collective bargaining agreement be enforced.

Important policies support the enforceability of the maintenance rate involved in this case, policies unduly discounted and undervalued by the district court in *Rutherford*. Congress viewed collective bargaining as a key instrument in its effort to promote industrial peace. *Hendricks*, 696 F.2d at 676. Our national labor policy is built on the premise that employees can bargain most effectively for improvements in wages, hours, and working conditions by pooling their economic strength and acting through freely chosen labor organizations. *NLRB v. Allis-Chalmers Manufacturing Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967). Consequently, this court will not lightly embrace the repudiation of contractual obligations enumerated in a collective bargaining agreement and will "choose the rule that will promote the enforcement of collective bargaining agreements." *Toyota Landscape Co.*, 726 F.2d at 528 (citing *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957)). Although the right to maintenance is presumed to exist because of its establishment at common law, its rate may be subject to the negotiation process. "The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant." *United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578–79, 80 S.Ct. 1347, 1350–51, 4 L.Ed.2d 1409 (1960). "Thus, it is clearly the policy of our national labor legislation to encourage both labor and management to negotiate contracts that will effectively

regulate every aspect of their complex relationship." *Winston-Salem Printing Pressmen v. Piedmont Publishing Co.,* 393 F.2d 221, 225–26 (4th Cir.1968). As the Supreme Court has noted, "[t]he mature labor agreement may attempt to regulate all aspects of the complicated relationship, from the most crucial to the most minute over an extended period of time." *United Steelworkers of America,* 363 U.S. at 580, 80 S.Ct. at 1350–51.

Here, the parties to the agreement included the traditional right to maintenance as a subject of the negotiating process. The resulting collective bargaining agreement incorporated an explicit rate of maintenance as one of its terms. We cannot fairly say that this rate, as a consequence of the normal "give and take" process of collective bargaining, is not entitled to the same reliability accorded to other terms and conditions within the same agreement. The national labor policy of promoting and encouraging collective bargaining agreements would be unduly compromised were we to conclude otherwise.

In considering the collective bargaining process which occurred in this case, we first note that there has been no allegation that the collective bargaining agreement as a whole is unfair or inadequate. This is significant because we do not believe the rate of maintenance specified in the collective bargaining agreement can be examined in isolation. "The rate of maintenance is but one of many elements contained within the Union contract and over which the parties negotiate, and there may be a considerable amount of 'give and take' exercised by the parties in coming to a final agreement on all of the elements." *Grove v. Dixie Carriers, Inc.,* 553 F.Supp. 777, 780 (E.D.La.1982). Although traditional maritime law would not substitute wages, paid vacation or accumulated leave time for maintenance, *Morel v. Sabine Tower & Transportation Co.,* 669 F.2d 345, 346–47 (5th Cir.1982), the nature of the "give and take" process of collective bargaining suggest that acceptance of a particular package of benefits should be binding on the union members. The contract at issue in this case provides for overtime, premium and penalty pay for unpleasant tasks, for very generous vacation allowances, and for such amenities as television sets and feature films, washers/dryers, ice cream and fresh baked bread. The adequacy of the maintenance rate should not be examined in isolation by the court because the determination of its adequacy in relation to the whole scheme of benefits has already been made by the union and the seamen who voted for the contract. We note that courts which have held that seamen must receive more than $8.00 for maintenance were deciding on the adequacy of the rate for *nonunion* seamen. *See, e.g., Incandela,* 659 F.2d at 13; *Caulfield v. AC & D Marine, Inc.,* 633 F.2d 1129, 1132 (5th Cir. 1981); *Tate v. American Tugs, Inc.,* 634 F.2d 869 (5th Cir.1981); *Gauthier v. Crosby Marine Service, Inc.,* 499 F.Supp. 295 (E.D.La.1980); *Robinson v. Plimsoll Marine, Inc.,* 460 F.Supp. 949 (E.D.La.1978).

A second consideration which persuades us the bargained for rate should be enforced is that the facts in this case demonstrate that there was real bargaining over the maintenance rate. In 1975 the Marine Engineers Beneficial Association requested an increase in the maintenance rate to $20.00 and in 1981 the Seafarers International Union asked for an increase to $12.00. Both proposals were withdrawn as part of the give and take of collective bargaining. Thus, the parties have bargained for maintenance as a part of the overall benefits package. In addition to maintenance and unearned wages to the end of the voyage (the traditional right of maintenance), and full health and hospitalization benefits (the traditional right to cure), the ill or injured seaman receives free transportation to his home port and a disability pension. We hold that when a benefits package includes an express reference to a precise rate of maintenance, the adequacy of this rate, considered in isolation, is not a subject for judicial speculation when the rate is part of a total package of wages and benefits resulting from the process of collective bargaining.

*Vitco v. Joncich,* 130 F.Supp. 945 (S.D. Cal.1955), *aff'd,* 234 F.2d 161 (9th Cir.1956), is not controlling here. In *Vitco,* the district court invalidated a contract provision which allowed the employer to withhold the unearned wages of seamen incapacitated due to illness while preserving the unearned full wages for seamen incapacitated due to injury. The court reasoned that this abrogation of the right to wages was contrary to public policy. 130 F.Supp. at 951. Unlike the contract in *Vitco,* "which without *quid pro quo* deprive[d] a seaman of wages because of unavoidable illness during the term of his employment," *id.* at 951, the contract here does not abrogate a maritime right. Rather, it expressly recognizes the maritime right to maintenance and seeks to preserve it as part of the overall negotiating process. We wish to emphasize that *Vitco* continues to have vitality and will control should a situation arise in which a mere token amount is designated for maintenance without a genuine *quid pro quo* arrived at through collective bargaining.

## IV.  CONCLUSION

We conclude that the national labor policy of encouraging the use and reliability of collective bargaining agreements, together with the realistic give and take occurring within the collective bargaining process, justify enforcement of the specified rate of maintenance contained in the agreement here. The district court's denial of the Defendants' motion for summary judgment is REVERSED and the cause is REMANDED for proceedings consistent with this opinion.

FLETCHER, Circuit Judge, concurring and dissenting:

I concur in that portion of the majority opinion that concludes federal labor statutes have not preempted federal maritime common law. I respectfully dissent, however, from the majority's conclusion that a union can bargain away the individual seaman's common law right to maintenance by agreeing to a wholly inadequate figure as a daily maintenance rate.

The ancient right to maintenance originated in medieval sea codes. G. Gilmore & C. Black, *The Law of Admiralty* § 6-6, at 281 (2d ed. 1975). The purposes of maintenance are to protect "poor and friendless" seamen from the broad variety of hazards encountered at sea, to encourage seamen "to engage in perilous voyages with more promptitude, and at lower wages," and to promote marine commerce. *Vella v. Ford Motor Co.,* 421 U.S. 1, 3-4, 95 S.Ct. 1381, 1382-83, 43 L.Ed.2d 682 (1975); *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 727, 63 S.Ct. 930, 932, 87 L.Ed.2d 1107 (1943); G. Gilmore & C. Black, *supra,* § 6-6, at 281 (quoting *Harden v. Gordon,* 11 F.Cas. 480, 483 (C.C.D.Me.1823) (No. 6047)). The doctrine imposes liability regardless of fault and arises out of the employment relationship. *Aguilar,* 318 U.S. at 730, 63 S.Ct. at 933-34.

The duty to pay maintenance is imposed by the general maritime law. *Cortes v. Baltimore Insular Line, Inc.,* 287 U.S. 367, 371, 53 S.Ct. 173, 174 (1932); 2 M. Norris, *The Law of Seamen* § 26:8, at 20 (4th ed. 1985). No private agreement is competent to abrogate the shipowner's duty to pay maintenance. *De Zon v. American President Lines, Ltd.,* 318 U.S. 660, 667, 63 S.Ct. 814, 818 (1943); *Cortes,* 287 U.S. at 371, 53 S.Ct. at 174. The right to maintenance consists of the right to payments sufficient to provide the seaman with food and lodging of the kind and quality received aboard ship. *Calmar Steamship Corp. v. Taylor,* 303 U.S. 525, 528, 58 S.Ct. 651, 653, 82 L.Ed. 993 (1938). These Supreme Court cases that recognize the broad reach of maintenance and its historic origins rooted in the genesis of maritime law compel my dissent. If changes in the law of maintenance are to be effected, such changes should originate with Congress, not this court.

Although the majority concludes that "federal labor statutes have not preempted maritime law [relating to maintenance]," it nonetheless allows a union to bargain away

the individual seaman's right to maintenance. It requires only that the collective bargaining agreement include an "express reference" to maintenance. In effect, as long as the parties to a collective bargaining agreement formally designate some nominal figure as a daily maintenance rate, a disabled seaman cannot recover even the cost of inexpensive food and lodging.

A number of incongruities and inequities may result from the majority's holding. For example, seamen with favorable bargaining agreements that contain no maintenance terms would be entitled to receive the full cost of their food and lodging when injured or ill, while those with less favorable bargaining agreements that specify a nominal maintenance rate would receive only that inadequate maintenance. Or union seamen and non-union seamen working for the same employer might receive different maintenance rates. Since the premise underlying maintenance is that seamen and their unions are unable or too improvident to protect disabled seamen's interests adequately, it is anomalous for this court to rubberstamp any bargained-for amount as long as it is labelled "maintenance."

I find the district court's approach in the case at bar, following its decision in *Rutherford v. Sea-Land Service, Inc.*, 575 F.Supp. 1365 (N.D.Cal.1983), to be sound. The district court in *Rutherford* held that a seaman should be permitted to challenge a bargained-for maintenance rate if he can demonstrate that it is "inadequate to provide [him] with food and lodging of the kind and quality he would have received aboard [his] vessel ... according to his circumstances (*i.e.*, where he recuperated ...)." *Id.* at 1374. If a seaman cannot demonstrate that the bargained-for maintenance rate falls below this minimal threshold, then courts should not repudiate the bargained-for rate. As long as the maintenance rate on which the parties have agreed equals or exceeds this minimum threshold of adequacy, courts should treat it as a legitimate subject of collective bargaining that should not be disturbed.

Fed.R.Evid. 201(b) permits a court to take judicial notice of a fact if it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The district court in *Rutherford* reviewed a number of recent cases finding $8.00 per day to be inadequate and awarding higher maintenance amounts based on actual expenses. *See id.* at 1370. Based on these authorities, the district court concluded that "it is now generally recognized that $8.00 per day is no longer a sufficient sum for a seaman to secure lodging and three meals." *Id.* The district court therefore appropriately took judicial notice that a maintenance rate of $8.00 per day in San Francisco is inadequate. *Id.* I thus conclude that the seaman is not bound by the maintenance provision in the collective bargaining agreement. I would affirm the district court.