Christina GHEORGHITA, Plaintiff,

v.

ROYAL CARIBBEAN CRUISES, LTD., d/b/a Royal Caribbean International, Defendants.

No. 98–2156–CIV–H.

United States District Court, S.D. Florida.

Feb. 10, 2000.

---

Charles R. Lipcon, Miami, FL, for plaintiff.

Mercer K. Clarke, Miami, FL, for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOEVELER, Senior District Judge.

THIS CAUSE was tried before the undersigned without a jury on November 15 and 16, 1999. Having reviewed pertinent portions of the file and the various documents submitted as evidence, and having heard and considered the testimony of the witnesses and the arguments of the parties

at trial, the Court now makes the following findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

## BACKGROUND

This proposed class action was filed on behalf of Christina Gheorghita and a purported class of tip-earning employees[1] who did not receive tip income while on sick leave.[2] Count I seeks "maintenance and cure", a traditional maritime remedy, in the form of "reasonably anticipated lost tips" as part of the employees' sick or unearned wages.[3] Count II seeks a declaratory judgment that the pertinent collective bargaining agreement (between the Norwegian Seaman's Union and Defendant) does not apply to Plaintiff and the class of non-Norwegian employees which she purports to represent.

Defendant argues that Plaintiff agreed to the terms of the collective bargaining agreement when she started her employment as a cabin stewardess, and that Plaintiff was paid all of the unearned wages that she was due under that agreement.

## FINDINGS OF FACT

1. Christina Gheorghita was employed by Royal Caribbean as a cabin stewardess on the vessel Enchantment of the Seas as of December 7, 1997, the date on which she signed the "Sign-On Agreement". Plaintiff's Exhibit (hereinafter "Exh.") 1–A, Defendant's Exh. 6.

2. At the appropriate place on that Agreement, Gheorghita signed a statement indicating that "I have received a copy of the terms and conditions of employment which I understand and accept." Pl's Exh. 1–A, Def's Exh. 6.

3. Gheorghita also signed a form titled "Specific Information Pertaining to Certain Terms and Conditions of Employment". On that form is the following statement: "I acknowledge receiving a copy of the *Collective Bargaining Agreement*" (emphasis in original). Pl's Exh. 1–B, Def's Exh. 5.

4. On February 19, 1996, a representative of Royal Caribbean Cruises Ltd. and a representative of the Norwegian Seamen's Union signed the Protocol adopting "A Collective Bargaining Agreement Between Royal Caribbean Cruises Ltd and Norwegian Seamen's Union". Def's Exh. 1. That Collective Bargaining Agreement was in effect at the time Gheorghita entered into her employment agreement on December 7, 1997. Def's Exh. 1.

5. The Collective Bargaining Agreement, which was signed by the same individuals who signed the protocol, was reached after negotiations between Royal Caribbean and the Norwegian Seamen's Union which occurred on nine separate occasions between October 18, 1995, and February 19, 1996. Testimony of Thomas Murrill (Vice President of Human Resources for Defendant).

6. The Collective Bargaining Agreement is patterned after an international model agreement for transport workers, and was approved by the International Transport Worker's Federation, of which the Norwegian Seaman's Union has been a member since approximately 1910. The Agreement meets or exceeds standards adopted by

---

1. Employees of cruise lines who live and work on the vessels during the voyages still are referred to as "seamen" in modern maritime caselaw. The Court has decided to use the term "employee" to refer to Plaintiff and those similarly situated, particularly in light of Plaintiff's gender. The use of such term, however, does not indicate a departure from traditional maritime principles of protecting the rights of the seaman.

2. Plaintiff alleges that the class exceeds 5,000 and that the class period is "3 years preceding the filing of this action".

3. Plaintiff also sought compensation for laundry expenses, as to which this Court has entered summary judgment in favor of Defendant. *See Order Granting, in part, Motion for Summary Judgment on Count I*, November 8, 1999. In addition, the Court entered judgment for Defendant as to Plaintiff's claim for punitive damages under Count I. *Id.*

that Federation. Testimony of Johan Oyen (Director of Cruise Operations for the Norwegian Seaman's Union).

7. Gheorghita never voted on union representation nor paid dues directly to the Norwegian Seamen's Union ("Union"). Testimony of Gheorghita. Non–Norwegian employees of Defendant do not participate in Union voting. Defendant paid annual dues of approximately $300,000 to the Norwegian Seamen's Union on behalf of approximately 7,000 non-Norwegian and non-Filipino employees in the catering division of the company. Testimony of Oyen.

8. According to the Sign–On Agreement and the statement regarding the Terms and Conditions of employment, Plaintiff had a contract of six months duration with Defendant, beginning on December 7, 1997, and ending on June 7, 1998, to work on the "Enchantment of the Seas" as a cabin stewardess. Pl's Exh. 1–A, Def's Exhs. 5, 6. The Collective Bargaining Agreement (Def's Exh. 1) provides that employees shall sign on for an "agreed period", not exceeding ten months, with the length of the period to be decided by the Defendant, Article 4, ¶ 1. The Agreement also provides that the contract can be terminated "if the Employee becomes ill or injured and has to sign off the vessel", Article 5, ¶ 3, and that the employment agreement "will be regarded as being terminated from the date the Employee signs off the vessel", Article 9, ¶ 5. Moreover, the contract can be terminated by Defendant without cause or notice, Article 5, ¶ 3, provided that the employee receives severance pay as indicated.[4]

9. Gheorghita was first hired by an agent of Royal Caribbean in Romania, on or about January 22, 1996, and had worked during two contract periods prior to the period which is at issue. Pl's Exh. 1, Testimony of Georghita.

10. Royal Caribbean's policy was to require hiring agents to provide a copy of the Collective Bargaining Agreement to each newly hired person, and to distribute copies of the Agreement to employees at orientations on board the vessel. Testimony of Malcolm Lynch (Director of Hotel Human Resources for Defendant). Further, Royal Caribbean posted a notice outside the crew purser's office stating that the Agreement was available for review. Testimony of Lynch.

11. Although Gheorghita denies ever noticing this sign or receiving a copy of the Collective Bargaining Agreement, the Court finds that Gheorghita had ample opportunity to obtain a copy of the Agreement even if she was not provided with a copy at the time she signed the Specific Information Pertaining to Certain Terms and Conditions of Employment, acknowledging receipt of the Agreement. Pl's Exh. 1–B, Def's Exh. 5.

12. Gheorghita's Sign–On Agreement specified that she would be earning monthly actual pay of $50, and a "permanent monthly guaranteed" pay of $721. Pl's Exh. 1–A, Def's Exh. 6. The Collective Bargaining Agreement, Article 2, ¶ 2, provides that employees in the category which includes Cabin Stewardess (Gheorghita's position) "shall have Gratuities per day from each passenger". The Minimum Pay Scale appended to that Agreement indicates that a cabin stewardess would receive a minimum of $721 monthly basic pay and overtime "inclusive of gratuities provided by passengers other than $50 per month ... to be paid by employer". Def's Exh. 1, Minimum Pay Scale.

13. Defendant advises its passengers that the recommended tips for cabin stewardesses are $3.50 per day for each person in the room. Testimony of Gheorghita.[5]

---

4. The employee is entitled to the lesser of the "Total Monthly Guaranteed Pay" for the remainder of the service period or two months

"Basic Wages". Def's Exh. 1, Collective Bargaining Agreement, Article 5, ¶ 3.

5. Gheorghita's testimony, which was uncontradicted as to the recommended tip amount,

Tips are collected by each cabin stewardess directly from the passengers (through the use of an envelope left in each room) at the end of each cruise voyage, without supervision by Defendant. Gheorghita's tips totalled approximately $2,500/month (approximately $82.19/day). Testimony of Gheorghita.

14. Plaintiff was injured or became ill at some time in January 1998 and reported to the ship's doctor on Saturday, January 24, 1998, with "flu symptoms", claiming weakness and abdominal pain. She was declared "fit for duty". Pl's Exh. 4. Plaintiff did not want to miss work the next day because she wanted to collect her tips for the week's voyage which was just ending. Testimony of Gheorghita.

15. On Sunday, January 25, 1998, Plaintiff reported to the ship's doctor complaining of exhaustion, headache and pelvic pain. She was confined to her cabin on that day—a day on which the ship departed Miami to begin a new voyage—but the medical report does not declare her "not fit for duty", nor does it include a referral for a shoreside physician. Pl's Exh. 4, Testimony of Gheorghita.

16. On Sunday, February 1, Gheorghita saw a shoreside physician, who made no finding as to whether she was fit for duty. Pl's Exh. 4. She returned to the ship. Testimony of Gheorghita.

17. On Wednesday, February 4, Plaintiff visited the ship's doctor with a complaint of lower back pain, but was declared "fit for duty", and was given a "Shoreside referral date" of February 8, 1998. Def's Exh. 4.

18. On Friday, February 6, Plaintiff visited the ship's doctor, who determined that she was "fit for duty" but that she should work at a sitting down position. Pl's Exh. 4. Def's Exh. 3. Gheorghita subsequently

worked answering phones at the bell station. Testimony of Gheorghita.

19. Gheorghita left the vessel on February 8, 1998, and never reported back for work. Testimony of Gheorghita.

20. Plaintiff was not fit for duty from Sunday, January 25 until Saturday, January 31, 1998 (seven days), and testified that she did not collect tips at the end of that voyage. Although the shoreside physician did not explicitly declare her unfit for duty on Sunday, February 1, it appears that Plaintiff was still incapacitated until she visited the ship's medical office on Wednesday, February 4, at which time she was declared "fit for duty". Thus, she was unable to perform her duties for a total of ten days.

21. Gheorghita either worked for two days, February 4 and 5, or failed to report for work on those days despite being fit for duty. She then again visited the ship's medical office and was deemed fit for duty but was directed to perform alternate work (sitting down, bell station attendant) from Friday, February 6, until Sunday, February 8 (two days). She testified that she did not collect her tips on Sunday, February 8, and that the person who cleaned cabins on her behalf received the tips from that voyage—without sharing them with her. Testimony of Gheorghita.

22. As the Enchantment of the Seas sailed each Sunday from Miami and returned the following Sunday, the length of each voyage was one week. Testimony of Gheorghita.

23. The Collective Bargaining Agreement specifies that an employee at Gheorghita's rank ("Cabin Stewardess") is entitled to sick pay of $12.50/day, for up to 112 days after signing off the vessel. Def's Exh. 1, Article 9, § 3 and Minimum Pay Scale. The Agreement contains no specific provision regarding payment of wages to an

---

apparently reflects the tip rate contained in a more recent collective bargaining agreement. *See* Def's Exh. 1, Collective Bargaining Agreement, Minimum Pay Scale, "[E]mployer will

recommend that passengers pay gratuities ... to cabin steward/ess ... [of] three dollars per passenger per day."

employee who is not fit for duty but remains on the vessel.

24. Gheorghita was paid sick wages of $12.50/day ($375/month) from February 9, 1998, until June 10, 1998 (approximately 120 days), when the rate dropped to $5/day and continued until September 25,1998. Pl's Exh. 2. A total of $1,915 in sick wages was paid. Def's Exh. 8.

25. On September 22, 1998, Gheorghita was declared to have reached maximum medical improvement by Dr. Gary Lustgarten. Pl's Exh. 6.

26. In addition to sick wages, Gheorghita was paid "maintenance" of $25/day from April 8 until September 25, 1998. Def's Exh. 8. (Records were not provided for the period May 18—May 28.) [6]

## CONCLUSIONS OF LAW

1. The traditional remedies of maintenance and cure provide an employee of a seagoing vessel with a daily living allowance designed to cover food and lodging (maintenance) in addition to actual payments for therapeutic, medical or hospital expenses (cure) during periods of illness or injury while the employee is in the service of the ship. The right to such benefits "extends during the period when [he] is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." *Vaughan v. Atkinson*, 369 U.S. 527, 531, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir.1979).[7]

■ 2. An employer cannot abrogate the duty to pay maintenance, *Cortes v. Balti-*

*more Insular Line*, 287 U.S. 367, 371, 53 S.Ct. 173, 77 L.Ed. 368 (1932); however, the amount of maintenance may be established in a contractual relationship between the seaman and the employer, *Baldassaro v. U.S.*, 64 F.3d 206, 213 (5th Cir.1995) (rejecting challenge to collectively bargained maintenance rate of $8/day); *Al–Zawkari v. American S.S. Co.*, 871 F.2d 585, 588 (6th Cir.1989) (same); *Macedo v. F/V Paul & Michelle*, 868 F.2d 519, 522 (1st Cir.1989) (same, as to $10/day rate); *Gardiner v. Sea–Land Service, Inc.*, 786 F.2d 943, 949 (9th Cir.1986) (same, as to $8/day rate); *But see, Barnes v. Andover Co., L.P.*, 900 F.2d 630, 640 (3rd Cir.1990) (despite collectively bargained rate of $8/day, seaman can establish right to increased maintenance by proving actual higher daily expenses).[8]

■ 3. The right to recover unearned wages, which is a separate component of the right to maintenance and cure, *Archer v. Trans/American Services, Ltd.*, 834 F.2d 1570 (11th Cir.1988), similarly cannot be eliminated in an employment contract, *Dowdle v. Offshore Express, Inc.*, 809 F.2d 259, 263 (5th Cir.1987). While the Court has found no binding precedent regarding whether the *rate* of unearned wages can be regulated in an employment contract,[9] it is clear that the *period* during which such wages must be paid can be measured by reference to such an agreement, *Archer*, 834 F.2d at 1575 (awarding unearned wages for specified contract period). Absent such an agreement, unearned wages are paid until the end of the voyage. *Vickers v. Tumey*, 290 F.2d 426, 434 (5th Cir. 1961). Thus, the period of entitlement to

---

**6.** It appears that Plaintiff stayed in a hotel after signing off the vessel. Testimony of Gheorghita. This lodging was presumably paid directly by Defendant, at least until the maintenance payments to Plaintiff commenced on April 8, 1998. In any event, Plaintiff does not raise a claim for unpaid maintenance.

**7.** The Eleventh Circuit has adopted as binding precedent all decisions of the Fifth Circuit rendered prior to October 1, 1981. *Bonner v.*

*City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

**8.** Plaintiff received $25/day as maintenance until she reached maximum medical improvement (and for a few days thereafter) and does not claim any unpaid medical expenses.

**9.** "We therefore need not decide whether the right to unearned wages may be modified by contract...." *Aksoy v. Apollo Ship Chandlers, Inc.*, 137 F.3d 1304, 1306 (11th Cir.1998).

unearned wages (either to end of voyage or end of contract period) differs from the period of entitlement to maintenance and cure (until maximum medical recovery). *Barnes,* 900 F.2d at 643 ("After that wage obligation [until the end of the voyage or end of contractual employment period] lapses [the seaman] is entitled only to maintenance and cure....").

4. The right to unearned wages as a component of maintenance and cure is a limited remedy. "[W]ages, in the maintenance-wages-cure sense is a very limited award. Perhaps offsetting its limited nature in terms of duration is the compensating feature that for an illness or injury suffered in the service of the ship, such wages are due as a matter of right wholly without regard to unseaworthiness or negligence or both." *Vickers v. Tumey,* 290 F.2d 426, 434 (5th Cir.1961) ("While loss of wages as an element of damages may perhaps extend almost indefinitely for the probably employable life of the seaman, that is not so with regard to this limited duty to pay wages as a part of cure".). *See also, Farrell v. U.S.,* 336 U.S. 511, 518, 69 S.Ct. 707, 93 L.Ed. 850 (1949) ("[M]aintenance and cure is more certain if more limited in its benefits."); *Berg v. Fourth Shipmor Associates,* 82 F.3d 307, 309 (9th Cir.1996) ("vessel owner must pay unearned wages for a limited period").

■ 5. Unearned wages are those that the employee would have earned had she been able to complete the terms of employment, *Archer,* 834 F.2d at 1574–75, and include reasonably anticipated tips when the employment agreement incorporates the receipt of such gratuities by the employee. *Aksoy v. Apollo Ship Chan-*

*dlers, Inc.,* 137 F.3d 1304 (11th Cir.1998) (entitled to average tip earnings where contract specified $503 monthly guaranteed income inclusive of gratuities but did not place a ceiling on estimate of tips to be received); *Flores v. Carnival Cruise Lines,* 47 F.3d 1120 (11th Cir.1995) (entitled to average tip earnings where contract provided for $45 monthly salary and specified that tips "may go as high as" $1000/month).

■ 6. The period as to which unearned wages must be paid is determined by reference to the contractual relationship. When a seagoing employee has no contract or has a contract with no enforceable term of duration, she only is entitled to unearned wages from the time she becomes unfit for duty to the end of that voyage. *Farrell,* 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850 (despite contract specifying term "not exceeding" twelve months, employee only entitled to wages until completion of voyage during which he was injured); *Joaquim v. Royal Caribbean Cruises,* 1995 WL 232394, 52 F.3d 1071 (11th Cir.1995) (unpublished decision) [10] (approving of determination that since cruiseship busboy's contract was terminable "without any reason", unearned wages were only due for time between date of injury and conclusion of voyage; remanding case since no record regarding length of voyage); *Nichols v. Barwick,* 792 F.2d 1520 (11th Cir.1986) (injured seaman without contract entitled to wages only until end of voyage and not for remainder of shrimping season where voyages lasted one day); *Vickers,* 290 F.2d 426 (unearned wages due only until end of voyage, which was when ship reached next port) [11]. Al-

---

10. *See, also, Joaquim v. Royal Caribbean Cruises,* 52 F.3d 1071 (table of decisions without opinions).

11. An earlier decision by the Fifth Circuit awarded wages for the remainder of a one month period, despite the lack of a written agreement, apparently because the employee was paid monthly. *Rofer v. Head & Head, Inc.,* 226 F.2d 927 (5th Cir.1955) (cook who fell ill during "coastwise voyage" was entitled

to wages for remaining five days in the month during which he was serving). And an even earlier decision by our predecessor circuit, *Martinez v. Matson S.S. Co.,* 97 F.2d 19 (5th Cir.1938), noted in passing that an ill seaman's wages were properly paid to the "end of the voyage".

though in *Flores* the court awarded wages until the "end of [Flores' twelve month] contract", 47 F.3d at 1127, the contract at issue contained no provision regarding termination and the court observed that unearned wages are to be awarded for "the duration of the voyage or contract period".[12] *Id.*

7. The "Collective Bargaining Agreement Between Royal Caribbean Cruises Ltd and Norwegian Seamen's Union" signed on February 19, 1996, Def's Exh. 1, applies to Gheorghita, as she has failed to demonstrate that it is a "sham" or "ruse".[13]

■ 8. The Collective Bargaining Agreement specifies that the employment agreement "will be regarded as being terminated from the date the Employee signs off the vessel". Article 9, ¶ 5. In addition, because the Collective Bargaining Agreement provides that the contract can be terminated without cause or notice, Def's Exh. 1, Article 5, ¶ 3, and therefore does not represent an enforceable (six month) term of employment, Gheorghita is only entitled to unearned wages until the end of the voyage during which she became ill.[14]

10. The Court concludes that Plaintiff is entitled to unearned wages for the voyage of Sunday, January 25, 1998, until Sunday, February 1, 1998. Plaintiff is also entitled to unearned wages for the three days during which she was not fit for duty on the voyage of Sunday, February 1, 1998, until Sunday, February 8, 1998.

■ 11. Although Plaintiff worked as a bell desk attendant during two days (February 6 and 7), she is entitled to receive the estimated actual earnings of her usual

**12.** *But see Archer v. Trans/American Services, Ltd.,* 834 F.2d 1570 (11th Cir.1988). In *Archer,* the appellate court held that unearned wages should be paid for the full term of the one year contract for a seaman who was injured on a personal trip while on shore leave. A study of the file before the lower court in *Archer,* Case No. 84–2059–CV–EPS, reveals that the contract at issue was terminable by either party on seven days notice, suggesting that it should not have been construed as definite in duration. Although the court in *Archer* cited the decisions in *Nichols* and *Vickers* with approval, each of those prior decisions held that wages were due only until the end of the voyage since there was no definite term of employment.

**13.** It bears observation that regardless of whether this "Collective Bargaining Agreement" is considered as a union-negotiated instrument or whether it is simply viewed as a statement of terms of employment, it is the case that Gheorghita had—at a minimum—constructive notice of such terms.

**14.** Indeed, no other conclusion is logical. Since the contract by its very terms is terminable without cause, Royal Carribean could discharge Gheorghita at any time—subject, of course, to payment of the severance pay which is specified in the Collective Bargaining Agreement. The statement that the employment period is of six months duration is merely one of expectation—not enforcement, for even if Gheorghita had arrived at the ship prepared to sail at some point during the remainder of her contract period, she had no right to continued employment and no claim that she had been discharged without cause. (Indeed, even if she had not been ill in the first instance—thereby triggering the termination of the agreement—she still would have no claim of discharge without cause, and would have only a claim for severance pay.)

When the alleged terms of duration of an employment agreement are inconsistent with provisions regarding terminability of that agreement, the contract is considered as having no enforceable or definite term. *Berg v. Fourth Shipmor Associates,* 82 F.3d 307 (9th Cir.1996) (seaman's ability to terminate contract on one day's notice inconsistent with coastwise articles providing that period was "not to exceed twelve calendar months"); *Gollberg v. Bramson Publishing Co.,* 685 F.2d 224 (7th Cir.1982) (where contract specified that it would remain in force for a period of twelve months but that it was terminable at will, the period of twelve months was merely an expectation and not a right guaranteed by the contract); *Buian v. J.L. Jacobs & Co.,* 428 F.2d 531 (7th Cir.1970) (contract statement referring to period of eighteen months assignment overseas, when read with other contract provisions regarding terminability without cause, only created "expectation" of employment and was not for definite duration); *Olsen v. Allstate Ins. Co.,* 759 F.Supp. 782 (M.D.Fl.1991) (absent a specific provision in the contract which converts the terminable at will provision into one requiring cause for termination, the agreement is terminable at will and is not for a definite duration).

position—Cabin Stewardess—for those days. (The position of "Bell Person" is identified in the Collective Bargaining Agreement, Def's Exh. 1, and the "monthly guaranteed pay" for that position is specified as $721, i.e., approximately $48.06/day. Had Defendant paid Gheorghita for the work she performed as a Bell Person, they would be entitled to reduce the payment of tips for those days by the amount of the wages already paid.) [15]

12. The amount of Plaintiff's unearned wages shall include the amount of estimated actual tips ($82.19/day), and a proportionate amount ($1.64/day) of the monthly actual pay to which Plaintiff was entitled for her work as a Cabin Stewardess. Complaint, ¶ 9. (As the estimated actual tips exceed the "monthly guaranteed" pay of $721, that lower figure does not control.) Pursuant to controlling precedent in the Eleventh Circuit, the total amount of unearned wages (representing estimated actual tips) to which Plaintiff is entitled is $1,005.96 (twelve days times $83.83/day).

13. Plaintiff is not entitled to tips for the two days on which she was fit for duty, February 4 and 5, despite her testimony that she did not receive her tips for that entire week. Plaintiff's medical records do not indicate that she was unable to work and, thus, it was Plaintiff's responsibility either to perform her duties or notify someone of her decision not to do so. Defendant does not police the collecting of tips nor their distribution among co-work-

ers in the event that a co-worker assists another during the week. Indeed, the tips are paid directly by the passengers and are not under the control of the employer. Plaintiff was able to work and, thus, was able to collect her tips. Her failure to do so is not the responsibility of the Defendant.

14. Pursuant to the Collective Bargaining Agreement, Plaintiff is also entitled to daily "sick pay" of $12.50 for up to 112 days after signing off the vessel. Def's Exh. 1, Art. 9, § 3. Although the employment agreement was regarded as being terminated upon Gheorghita's signing off the vessel, the Collective Bargaining Agreement provides that such wages will be paid, and Defendant has already paid this sum.[16] Def's Exh. 8. *See also* Defendant's Motion for Summary Judgment, Exhibit B (Affidavit of David Blackwell).

## CONCLUSION

Despite Plaintiff's allegations that the Collective Bargaining Agreement as a whole is unfair, the Court has determined that its terms apply to this case. That Agreement terminates when an employee signs off the vessel; moreover, the Agreement is terminable by Defendant at any time without cause. Thus, by its very terms it is limited and does not include an enforceable right to employment for a specific period. The Court therefore has awarded unearned wages only until the end of each of the two voyages during which Gheorghita was ill.[17]

15. The Court observes the apparent anomaly that this result permits with respect to the non-tip earning employees of Defendant—who are limited to those wages specified in the Collective Bargaining Agreement.

16. Defendant paid an additional amount of $515.00 in sick wages ($5 per day from the end of the 112 day period until Plaintiff reached maximum medical improvement), despite the lack of any obligation—either under maritime law, the law of this circuit or the Collective Bargaining Agreement.

17. Recognizing that there is no clear controlling precedent in this regard, the Court offers

the following observation. The Court has applied the law regarding "end of voyage" as the demarcation point for unearned wages in this case. If this is found to be error, and it is determined that Gheorghita should have unearned wages until the end of her contract period (June 7, 1998), it is nevertheless the Court's conclusion that Gheorghita is not entitled to tip income for the period after she left the vessel. The Court suggests that the specific rate at which unearned wages must be paid can be established in an employment agreement. The binding precedent is clear that the *period* of entitlement to such wages is determined by reference to the employment

Based upon the above, it is

ORDERED AND ADJUDGED that judgment shall be entered as to Count 1 in favor of Plaintiff and against Defendant for the amount of one thousand five dollars and ninety-six cents ($1,005.96), for which sum let execution issue.

In addition, the Court hereby dismisses Count II. Under the circumstances of the Court's findings and conclusions and in consideration of the amounts already paid to Plaintiff, it is apparent that she is not an adequate representative for the class on whose behalf she brings Count II. Further, the fact that the Court has determined that, at least with respect to Plaintiff, the Collective Bargaining Agreement represents a valid part of the employment contract, Plaintiff's allegations that it is a sham or ruse must fail. It is therefore

ORDERED AND ADJUDGED that Count II of the Complaint shall be DISMISSED. All other pending motions are hereby deemed MOOT.

---

contract—if one exists, *Flores*, 47 F.3d 1120, *Archer*, 834 F.2d 1570. The Court finds no impediment to referring similarly to such contract to determine the *rate* at which unearned wages must be paid. The contract reviewed in *Flores* (analysis of which governed the decision in *Aksoy*) was silent as to unearned or sick wages, and the appellate court rejected Carnival Corporation's attempt to pay cabin steward Mario Flores at the rate of his vacation pay ($161.97 bimonthly) in lieu of his average tips ($800/week) while he was ill. The court also noted the parties' specific expectation that the tip income Flores would receive would be as much as 2200% of his $45 monthly salary. 47 F.3d at 1126. The agreement at issue in the present case clearly is much more detailed and appears to provide more employee benefits than the agreement at issue in *Flores*. Because the Collective Bargaining Agreement is silent as to any special wages due while an employee is sick but remains on the vessel, the Court has applied controlling precedent regarding the calculation of tip income to determine the amount of those wages. The Collective Bargaining Agreement is clear, however, as to the amount of wages due after signing off the vessel, and such provisions do not violate any controlling precedent. Thus, under this alternative reasoning, i.e., that the right to unearned wages extends past the end of the voyage, Gheorghita would be entitled to her average tip income while on the vessel, and the contractually specified sick pay ($12.50/day) until the end of her contract (June 7, 1998).